UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
DIVISION OF SHREVEPORT

| | | |
|---|---|---|
| ERICA BROWN AND JEREMIAH GREEN, INDIVIDUALLY AND ON ON BEHALF OF THE ESTATE OF RUBY GREEN | § | CIVIL ACTION NO. 5:21-CV-02406-SMH-MLH |
| V. | § | JUDGE S. MAURICE HICKS, JR. |
| PMG OPCO-WASHINGTON, LLC D/B/A BOOKER T. WASHINGTON SKILLED NURSING & REHABILITATION AND KOURTNEY BROWNLEE | § | MAGISTRATE JUDGE HORNSBY |

**DEFENDANTS' SUPPLEMENTAL ARGUMENT AND AUTHORITY IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**…… ii

**A. *Mitchell* and *Perez* Correctly Hold That The PREP Act Is An Express Federal Jurisdiction Act, But (Contrary To Supreme Court Precedent) Incorrectly Limit That Holding To Only Willful Misconduct Claims.** 1

1. *Supreme Court Precedent Directs that Claims Under Acts with an Exclusive Federal Cause of Action and Exclusive Federal Jurisdiction Cannot Be Distinguished By Cause of Action Elements Including Standard of Liability.* 1

2. *Supreme Court Precedent Defies the* Mitchell *and* Perez *Holdings That Congress' Administrative Claims Process Impedes Federal Removal Jurisdiction* 7

**B. *Mitchell* and *Perez* Are Wrong On Federal Officer Removal As 28 U.S.C. §1442 Is Applicable to this Case** 7

*1. BTW Was a Louisiana All-COVID Center and Was a Critical Partner to the AHJ Response.* 8

*2. Congress Specifically Anticipated Federal Officer Involvement In the PREP Act Implementation and Litigation Process* 15

**CONCLUSION** 17

**TABLE OF AUTHORITIES**

*Cases*

*Advanced Physicians, S.C. v. National Football League*, 859 Fed.Appx. 695 (5th Cir. 2021) .......... 3, 5

*Aetna Health Inc. v. Davila*, 542 U.S. 200, (2004) .......... *passim*

*Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202 (1990) .......... 5

*Connecticut State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337 (11th Cir. 2009) .......... 3, 5

*DiFelice v. Aetna U.S. Healthcare*, 346 F.3d 442 (3d Cir. 2003) .......... 2

*El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473 (1999) .......... 6

*Fort Bend County, Texas v. Davis*, 139 S.Ct. 1843 (2019) .......... 7

*Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133 (1990) .......... 5

*Kelsey-Seybold Med. Grp. PA v. Great-West Healthcare of Texas, Inc.*, 611 Fed.Appx, 841 (5th Cir. 2015) .......... 3, 5

*Maglioli v. Alliance HC Holdings, LLC*, 16 F.4th 393 (3d Cir. 2021) .......... *passim*

*Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987) .......... 3, 5

*Mitchell v. Advanced HCS, L.L.C.*, 28 F.4th 580 (5th Cir. 2022) .......... *passim*

*Omni Manor Nurs. Home v. Thompson*, 151 Fed.Appx. 427 (6th Cir. 2005) .......... 10

*Perez v. Southeast SNF, L.L.C.*, No. 21-50412, 2022 WL 987187 (5th Cir., Mar. 31, 2022) .......... *passim*

*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987) .......... 5, 6

*Roark v. Humana, Inc.*, 307 F.3d 298 (5th Cir. 2002) .......... 5

*Yellow Freight System, Inc. v. Donnelly*, 494 U.S. 820 (1990) .......... 7

*Statutes*

28 U.S.C. §1442 .......... 7, 16

28 U.S.C. §1442(a) .......... 16, 17

29 U.S.C. §§1001, *et seq.*, the Employee Retirement Income Security Act of 1974 .................... 5, 6

42 U.S.C. §§1395h, *et seq.*, the Social Security Act ............................................................ 9, 10

42 U.S.C. §201, *et seq.*, the Public Health Service Act ............................................................ 9

42 U.S.C. §247d-6d (a)(1) ............................................................................................................ 4

42 U.S.C. §247d-6d(a)(1) .............................................................................................................. 6

42 U.S.C. §247d-6d(a)(2)(A)(ii) .................................................................................................... 4

42 U.S.C. §247d-6d(b)(1) .............................................................................................................. 4

42 U.S.C. §247d-6d(b)(8) .............................................................................................................. 4

42 U.S.C. §247d-6d(d)(1) ............................................................................................ 4, 5, 15, 16

42 U.S.C. §247d-6d(d)(2) .............................................................................................................. 5

42 U.S.C. §247d-6d(e)(1) .............................................................................................................. 4

42 U.S.C. §247d-6d(e)(5) ........................................................................................................ 4, 10

42 U.S.C. §247d-6d(e)(6) ............................................................................................................ 10

42 U.S.C. §247d-6d(f) ............................................................................................................ 15, 16

42 U.S.C. §247d-6d(i)(2) ............................................................................................................. 16

42 U.S.C. §247d-6e ........................................................................................................................ 7

42 U.S.C. §247d-6e(b)(5)(C) .......................................................................................................... 7

42 U.S.C. §247d-6e(d)(5) ............................................................................................................... 7

Tex. Civ. Prac. & Rem. Code Ann §§88.001-88.003, the Texas Health Care Liability Act ............ 6

*Other Authorities*

Declaration, 85 Fed. Reg. 15,198 (Mar. 17, 2020) .......................................................... 4, 8, 9, 10

Fourth Amended Declaration, 85 Fed. Reg. 79,190 (Dec. 3, 2020) ............................................... 8

HHS Advisory Opinion 20-04 (Oct. 23, 2020) ............................................................... 8, 9, 15

*In re Oaks of Mid City Nurs. & Rehab. Ctr.*, No. A-11-24, 2011 WL 2110679 (HHS Dept App. Bd., App. Div. Mar. 31, 2011) ........................................................................... 10

*Treatises*

Restatement (Second) of Torts § 519 (Am. L. Inst. 1977) .............................................................. 2

*Regulations*

42 C.F.R. §483.80.................................................................................................................. 11

42 C.F.R. §488.20.................................................................................................................. 10

45 C.F.R. §2.2(3) .................................................................................................................... 9

COME NOW Defendants PMG OPCO-Washington, LLC d/b/a Booker T. Washington Skilled Nursing & Rehabilitation Center ("BTW") and Kourtney Brownlee ("Brownlee"), by and through their undersigned counsel, and hereby submit this Supplemental Argument and Authority in Further Opposition to Plaintiff's Motion to Remand, in light of the decisions of *Mitchell v. Advanced HCS, L.L.C.*, 28 F.4th 580 (5th Cir. 2022) and *Perez v. Southeast SNF, L.L.C.*, No. 21-50412, 2022 WL 987187 (5th Cir., Mar. 31, 2022). Defendants show the Court as follows:

**A. *Mitchell* and *Perez* Correctly Hold That The PREP Act Is An Express Federal Jurisdiction Act, But (Contrary To Supreme Court Precedent) Incorrectly Limit That Holding To Only Willful Misconduct Claims.**

*1. Supreme Court Precedent Directs that Claims Under Acts with an Exclusive Federal Cause of Action and Exclusive Federal Jurisdiction Cannot Be Distinguished By Cause of Action Elements Including Standard of Liability.*

The first Circuit Court to consider the removability of PREP Act claims was *Maglioli v. Alliance HC Holdings, LLC*, 16 F.4th 393 (3d Cir. 2021). There, the Third Circuit found:

> The [PREP Act] statute's plain language cuts through the dense analysis that we would otherwise employ to determine whether Congress intended to create an exclusive cause of action.
>
> ***
>
> The PREP Act unambiguously creates an exclusive federal cause of action.
>
> ***
>
> The PREP Act's language easily satisfies the standard for complete preemption of particular causes of action. It provides an "exclusive cause of action ... and also set[s] forth procedures and remedies governing that cause of action."
>
> ***
>
> The Supreme Court has relied on the complete preemptive force of a statute to infer congressional intent to create an exclusive federal cause of action. Here [under the PREP Act], we have a better source of congressional intent: the words of Congress. Again, our analysis is straightforward. Congress said the cause of action for willful misconduct is exclusive, so it is.

*Maglioli*, 16 F.4th at 408-10. *Mitchell* – and by extension, *Perez* – adopt this reasoning. *Mitchell*, 28 F.4th at 587 (the PREP Act contains "clear congressional intent that the prescribed remedies be exclusive"); *Perez*, at *2 (opining that "*Mitchell* is on all fours with this case").

*Maglioli* goes on to incorrectly hold, though, that this express federal (removal) jurisdiction is limited to claims for willful misconduct liability and not for negligence liability:

> Willful misconduct is a separate cause of action from negligence. The elements of the state cause of action need not "precisely duplicate" the elements of the federal cause of action for complete preemption to apply. [*Aetna Health Inc. v.* ]*Davila*, 542 U.S. [200,] 216, 124 S.Ct. 2488 [(2004)]. But complete preemption does not apply when federal law creates an entirely different cause of action from the state claims in the complaint. *See DiFelice v. Aetna U.S. Healthcare*, 346 F.3d 442, 452–53 (3d Cir. 2003). Congress could have created a cause of action for negligence or general tort liability. It did not. Just as intentional torts, strict liability, and negligence are independent causes of action, so too willful misconduct under the PREP Act is an independent cause of action. *See* Restatement (Second) of Torts § 519 cmt. d (Am. L. Inst. 1977).

16 F.4th at 411;[1] *see also Mitchell*, 28 F.4th at 586-87 (relying on the *Maglioli* court's reasoning that willful misconduct and negligence are different "causes of action" and, therefore, Congress intended removal jurisdiction for the higher standard of liability claims only, and finding the remedy of the PREP Act compensation fund is not a "cause of action" supporting removal jurisdiction); *Perez*, at *2 (same).

*Maglioli, Mitchell*, and *Perez* get it half right. Like *Maglioli*, both *Mitchell* and *Perez* hold that the PREP Act provides for exclusive federal jurisdiction and, therefore, removal jurisdiction. However, each incorrectly limits that statutory grant of jurisdiction to claims asserting the higher standard of liability, to-wit: willful misconduct. Indeed, the PREP Act provides for federal removal jurisdiction, but the litmus test for that jurisdictional directive cannot be whether the state-law

[1] Notably, the Third Circuit's decision in *DiFelice* (cited by *Maglioli*) predated the Supreme Court's preemption analysis in *Davila*.

claim's elements are precisely mirrored where Congress' exclusive federal cause of action has left no independent state right. *See Davila*, 542 U.S. at 216. Accordingly, *Maglioli, Mitchell*, and *Perez* defy the Supreme Court authority of *Davila* on this point and should not be followed.

Once exclusive federal jurisdiction is provided, as *Maglioli*, *Mitchell*, and *Perez* all find in the PREP Act, the **scope** of that complete preemption is dictated by the Supreme Court's two-part test in *Davila*. *Advanced Physicians, S.C. v. National Football League*, 859 Fed.Appx. 695, 696 (5th Cir. 2021); *Kelsey-Seybold Med. Grp. PA v. Great-West Healthcare of Texas, Inc.*, 611 Fed.Appx, 841, 841 (5th Cir. 2015) (both discussing and applying the *Davila* scope of preemption test); *Connecticut State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1345 (11th Cir. 2009) (same). A "'cause[ ] of action within the scope of the [Act] [is] removable to federal court.'" *Connecticut State Dental*, 591 F.3d at 1344, quoting *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 60 (1987).

The *Davila* "scope" test must be followed to determine the breadth of Congress' exclusive federal cause of action. As applied to the PREP Act, this test thus requires two inquiries: (1) whether the plaintiff "could have brought its claim under [the PREP Act;]" and (2) whether "'there is no other independent legal duty that is implicated by a defendant's actions.'" *Kelsey-Seybold*, 611 Fed.Appx. at 841, quoting *Davila*, 542 U.S. at 210; *Advanced Physicians*, 859 Fed.Appx. at 696; *Connecticut State Dental*, 591 F.3d at 1345.

First, Plaintiffs' Petition plainly alleges that Defendants failed to appropriately administer covered countermeasures to prevent the Decedent from contracting COVID-19, including implementation of infection control countermeasures, sanitization, and directions for care promulgated by the Centers for Disease Control and Prevention and the Louisiana Department of Health and Hospitals ("LDHH"). Petition [Doc. 1-2], ¶¶7, 10, 12. Plaintiffs' Petition further alleges

that the Decedent died of COVID-19 (*id*., ¶8), the disease covered by the Secretary's Declaration and protected by the PREP Act. 42 U.S.C. §§247d-6d(a)(2)(A)(ii) (applying to a pandemic death), (b)(1) (Secretary makes determination what disease is covered by PREP); Declaration, 85 Fed. Reg. 15,198 (Mar. 17, 2020) (declaring COVID-19, its countermeasures, programs and facilities covered by PREP). And, the Petition also alleges that the death was a result of a licensed healthcare provider's use and administration of countermeasures, programs and facility. Petition [Doc. 1-2], ¶¶7, 10, 12. Accordingly, this claim for loss falls under the PREP Act and would have access to either a remedy under the administrative compensation fund or a litigation remedy. *Maglioli*, *Mitchell*, and *Perez*, however, hold that Plaintiffs cannot bring their negligence claims under the PREP Act because Congress only provides a federal cause of action for willful misconduct claims. *See* discussion, *supra*. The trilogy conflates the first and second prong of the *Davila* test. The Plaintiffs' claim here may be brought under the PREP Act — the Plaintiffs' claim just may not be viable under the required standard of liability, but Congress has dictated that is not this Court's concern.[2]

The second prong of the *Davila* test is met because in creating its exclusive federal cause of action, Congress expressly left no other independent duty or right. 42 U.S.C. §§247d-6d (a)(1) ("a covered person shall be immune from suit and liability under Federal and State law with respect to ***all claims for loss***") (emphases added), (b)(8) ("no State … may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement"), (d)(1) ("the sole exception to the immunity from suit and liability of covered persons … shall be for an exclusive Federal cause of action"), and (e)(1) (exclusive federal jurisdiction for claims under federal cause of action). Accordingly, Congress extinguished completely any and all other rights, duties, and

---

[2] If Plaintiffs insist on litigating in court, then that forum is the District Court for the District of Columbia (D.D.C.), and Congress has provided that only "[s]uch panel shall have jurisdiction over such action for purposes of considering motions to dismiss… ." §247d-6d(e)(5).

claims related to COVID-19 deaths asserting wrongdoing by a program planner and allegedly arising from the administration of a COVID countermeasure, program or facility, save its exclusive federal cause of action. Nothing else exists.

Through immunity, preemption, an exclusive cause of action, and a special three-judge district court in Washington, D.C., Congress has provided "[n]o legal duty (state or federal) independent of" the PREP Act. *Davila*, 542 U.S. at 210; *Kelsey-Seybold*, 611 Fed.Appx. at 841, *Advanced Physicians*, 859 Fed.Appx. at 696; *Connecticut State Dental*, 591 F.3d at 1345; 42 U.S.C. §§247d-6d(d)(1) and (2), (e)(1). This is true regardless of whether the asserted state cause of action "precisely duplicate[s] the elements" of the PREP claim or not. *Davila*, 542 U.S. at 216. And, this is true regardless of varying asserted causes of action with various standards of liability. As *Davila* found in the context of ERISA, 29 U.S.C. §§1001, *et seq.*:

> [T]he Court of Appeals found significant that respondents "assert a tort claim for tort damages" rather than "a contract claim for contract damages," and that respondents "are not seeking reimbursement for benefits denied them." [*Roark v. Humana, Inc.*,] 307 F.3d [298,] 309 [(5th Cir. 2002)]. But, distinguishing between pre-empted and non-pre-empted claims based on the particular label affixed to them would "elevate form over substance and allow parties to evade" the pre-emptive scope of ERISA simply "by relabeling their contract claims as claims for tortious breach of contract." *Allis–Chalmers* [*Corp. v. Lueck*], [471 U.S. 202,] 211, 105 S.Ct. 1904 [(1990)]. Nor can the mere fact that the state cause of action attempts to authorize remedies beyond those authorized by ERISA § 502(a) put the cause of action outside the scope of the ERISA civil enforcement mechanism. In *Pilot Life* [*Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987)], *Metropolitan Life*, and *Ingersoll-Rand* [*Co. v. McClendon*, 498 U.S. 133 (1990)], the plaintiffs all brought state claims that were labeled either tort or tort-like. *See Pilot Life*, 481 U.S. at 43, 107 S.Ct. 1549 (suit for, *inter alia*, " 'Tortious Breach of Contract' "); *Metropolitan Life, supra*, at 61–62, 107 S.Ct. 1542 (suit requesting damages for "mental anguish caused by breach of [the] contract"); *Ingersoll-Rand*, 498 U.S. at 136, 111 S.Ct. 478 (suit brought under various tort and contract theories). ***And, the plaintiffs in these three cases all sought remedies beyond those authorized under ERISA.*** *See Pilot Life, supra*, at 43, 107 S.Ct. 1549 (compensatory and punitive damages); *Metropolitan Life, supra*, at 61, 107 S.Ct. 1542 (mental anguish); *Ingersoll-Rand, supra*, at 136, 111 S.Ct. 478 (punitive damages, mental anguish). ***And, in all these cases, the plaintiffs' claims were pre-empted. The limited remedies available under ERISA are an inherent part of the "careful balancing" between ensuring fair and prompt enforcement of rights under a plan and the***

> ***encouragement of the creation of such plans***. *Pilot Life, supra*, at 55, 107 S.Ct. 1549.

*Davila*, 542 U.S. at 214-15 (emphases added). Note that in *Davila*, the plaintiffs attempted to bring a tort action under the Texas Health Care Liability Act, Tex. Civ. Prac. & Rem. Code Ann §§88.001-88.003 — a wholly separate cause of action from ERISA's contract-based federal cause of action. Yet, contrary to the rationale of *Maglioli*, *Mitchell*, and *Perez,* the Supreme Court holds that separate cause of action is completely preempted.

Regardless of whether a claim is drafted to sound in contract, tort, intentional tort, a willful or wanton standard of liability (as in punitive damages), some state statutory scheme, or simple negligence, those claims fall into the scope of the PREP Act because there is no other duty or right for "all claims for loss". 42 U.S.C. §247d-6d(a)(1). And, thus, those claims however pleaded are completely preempted by the PREP Act under the authority and application of *Davila*. *Maglioli*, *Mitchell*, and *Perez* improperly strip and illogically segment PREP Act language and intent. In casting such broad immunity and preemption, and in providing a generous administrative remedy, Congress did not intend partial complete preemption of litigation claims for "loss" of any sort: *Maglioli*, *Mitchell*, and *Perez* err in determining otherwise.

Where Congress "expressed an unmistakable preference for a federal forum," a federal forum shall be provided. *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 474, 485 at n. 7 (1999). "[O]nly the most zealous application of the maxim *expressio unius est exclusio alterius* could answer the implausibility that Congress would have intended to force defendants to remain in [state] courts". *Id.* at 487. Congress' choice to exclude a lesser liability standard does not impact the federal domination of COVID-19 countermeasure claims. *Id.* ("Now and then silence is not pregnant"); *Davila*, 542 U.S. at 215 ("limited remedies available under ERISA are an inherent part of [Congress'] 'careful balancing'").

Plaintiffs' Motion to Remand should be denied despite the rulings in *Mitchell* and *Perez*.

*2. Supreme Court Precedent Defies the Mitchell and Perez Holdings That Congress' Administrative Claims Process Impedes Federal Removal Jurisdiction*

*Mitchell* and *Perez* also err in finding the PREP Act compensation fund "withdraws jurisdiction from any court," citing 42 U.S.C. §247d-6e(b)(5)(C). *Mitchell*, 28 F.4th at 587 (emphasis removed). *See Perez*, at *2. First, the PREP Act's Section (b)(5)(C)'s language applies only to that "paragraph", which prohibits judicial review of only the covered countermeasure injury compensation table. Second, the PREP Act's required pre-litigation claims process is a required predicate administrative process. §247d-6e. Its remedy is elective to the pursuit of a litigation claim. *Id*., (d)(5). In no way does a predicate non-adjudicative, no-fault claims process impact the consideration of federal subject matter jurisdiction in a litigation forum. *Yellow Freight System, Inc. v. Donnelly*, 494 U.S. 820, 824 (1990); *Fort Bend County, Texas v. Davis*, 139 S.Ct. 1843, 1849-51 (2019). This faulty reasoning cannot be a basis for remand.

**B. *Mitchell* and *Perez* Are Wrong On Federal Officer Removal As 28 U.S.C. §1442 Is Applicable to this Case**

*Mitchell* and *Perez* incorrectly reject the application of Federal Officer Removal on different grounds and different arguments than are presented here. In contrast to those cases involving Texas facilities, Defendants demonstrate here that BTW was an All-COVID facility subject to the control and oversight of U.S. Department of Health and Human Services ("HHS"), the Centers for Disease Control and Prevention ("CDC") and the LDHH, which is a federal contractor for the Centers for Medicare and Medicaid Services ("CMS"). *See* Affidavit of Brownlee, Exhibit A, ¶¶3-6. Defendants also show that Congress and HHS both anticipated private federal officers would be used in response to a public health emergency and would need the protections of federal law, including the protection of a federal forum due to their assistance in performing a job the federal government could not do

for itself. In fact, HHS directed and controlled BTW as a program planner (*see* Response Letter, August 14, 2020), and as a CMS skilled nursing facility ("SNF") participant directly and through its federal contractor — LDHH. Accordingly, this Court should not follow the holdings of *Mitchell* and *Perez*.

1. *BTW Was a Louisiana All-COVID Center and Was a Critical Partner to the AHJ Response.*

BTW is a special type of program planner and operates under the direction of a federal contractor and a federal agency. HHS distinguishes declared "healthcare companies" like BTW as a subset of all potential program planners. HHS Advisory Opinion ("AO") 20-04, 1 (Oct. 23, 2020).[3] While HHS notes that *potential* program planners and qualified persons otherwise administering or using countermeasures, are distinguished from "**healthcare companies *that are part of a government response to the COVID-19 pandemic***." *Id*. (emphases added). This language and the other language from the PREP Act and HHS directives demonstrate that while BTW is a program planner, it is also much more since it belongs to a particular subset specifically referenced by HHS as "critical" members of the federal government response to the COVID-19 pandemic. *See e.g.*, Fourth Amended Declaration, n. 20 (Guidance, p. 1: "Enhancing the safety of nursing homes, assisted-living facilities, long-term-care facilities,... is critical for our Nation's response to the COVID-19 pandemic").[4]

---

[3] HHS incorporated all Advisory Opinions into its initial Declaration. Fourth Amended Declaration, 85 Fed. Reg. 79,190, 79,191 (Dec. 3, 2020).

[4] Here, "guidance" is interchangeable with "directive": "An Authority Having Jurisdiction [or "AHJ"] may authorize such activities through, among other things, guidance, requests for assistance, agreements, directives, or other arrangements (collectively guidance)". AO 20-04, 4 (emphases added); *id.* 1, 2 (generally recognizing that in addition to "guidance" HHS and its AHJs issue "directives" to program planners). An AHJ is a public agency or an "institution[] acting on behalf of governmental entities … that has legal responsibility and authority for responding to an incident, based on political or geographical … or functional ... range or sphere of authority." Declaration, 85 Fed. Reg. at 15,202; *see also* Fourth Amended Declaration, 85 Fed. Reg. at 79,197.

While immunity is broad for program planners and many may be *eligible* to become a program planner, HHS emphasizes that:

> "[L]iability immunity is afforded to Covered Persons ***only*** for Recommended Activities involving Covered Countermeasures that are related to" (1) federal agreements ***or*** (2) "***[a]ctivities <u>authorized in accordance with the public health and medical response of the Authority Having Jurisdiction</u> to prescribe, administer, deliver, distribute or dispense the Covered Countermeasures following a Declaration of an emergency***."

AO 20-04, 4, quoting Declaration, 85 Fed. Reg. at 15,202. This language demonstrates that HHS recognized BTW as a licensed facility working under its AHJs to fight COVID-19 pursuant to the federal government plan. *Id.*; *contra Maglioli*, 16 F.4th at 405 (nursing homes "are not government contractors"). This cited Declaration passage also indicates the significance of BTW's oversight and control by LDHH — an AHJ.

First, federal regulation provides that LDHH employees engaged in surveying, certifying, or enforcing the Social Security Act, 42 U.S.C. §§1395h, *et seq.*, and Medicare Act are federal "employees" of HHS for that purpose, to-wit:

> Employee of the Department includes current and former:
>
> ***
>
> (3) Employees of a contractor, subcontractor, or state agency performing survey, certification, or enforcement functions under title XVIII of the Social Security Act or Section 353 of the Public Health Service Act but only to the extent the requested information was acquired in the course of performing those functions and regardless of whether documents are also relevant to the state's activities.

45 C.F.R. §2.2(3). LDDH itself recognizes and enforces this regulatory federal employee status as it relates to their "performing survey, certification, or enforcement functions" and regardless of whether their activities "related to the state's activities":

> The Louisiana Department of Health and Hospitals (LDHH), Health Standards Section (HSS), is a state agency which performs survey, certification, or enforcement functions under the Social Security Act, 42 U.S.C. §§1395h, 1395u. Effective October 15, 2008, LDHH/HSS employees are included in the definition of

"employee" of the Department of Health and Human Services (the "Department")… .

*See* LDHH Letter to BTW counsel, January 19, 2010, Exhibit B.

Second, LDHH is a federal contractor with CMS, overseeing and inspecting SNFs like BTW in order to ensure compliance with federal requirements: "Facilities that contract with the Secretary of [HHS] are periodically inspected by state health agencies to ensure compliance with federal regulations." *Omni Manor Nurs. Home v. Thompson*, 151 Fed.Appx. 427, 428 (6th Cir. 2005), citing 42 U.S.C. §§1395aa, 1395i-3(g); 42 C.F.R. §488.20. LDHH is one such agency. *In re Oaks of Mid City Nurs. & Rehab. Ctr.*, No. A-11-24, 2011 WL 2110679, at *2 (HHS Dept App. Bd., App. Div. Mar. 31, 2011) (identifying LDHH as a state survey agency for the federal CMS).

Third, as a state agency, LDHH is also an AHJ under HHS's Declaration, as well as a "Person" and "Program Planner" under the PREP Act. 85 Fed. Reg. at 15,200 (defining "Authority Having Jurisdiction"); 42 U.S.C. §§247d-6d(e)(5) (defining "person" to include a "State, or local government agency or department"); (e)(6) (defining "program planner" a "State or local government"); *see also supra*, n. 4. LDHH oversaw, inspected, and controlled SNFs during the pandemic, specifically for compliance with ***federal*** infection control policies regarding COVID-19 countermeasure administration and use, COVID-19 programs, and COVID-19 facilities operations. For example:

> BTW was inspected by CMS, through the LDHH on May 7, 2020, June 22, 2020, July 14, 2020 and September 28, 2020 to assure compliance with federal COVID infection control program requirements. I have attached to this affidavit true and accurate copies of those CMS surveys and related correspondence from LDHH. Those surveys state in part:
>
> > [A] COVID 19 Focused Infection Control survey was conducted at your facility by the Louisiana Department of Health, Health Standards Section. The purpose of this survey was to determine if your facility was in compliance with State licensing standards and/or federal conditions of participation.

***

> A COVID-19 Focused Infection Control Survey was conducted on September 28, 2020 [and each of the other stated dates]. The facility was found to be in compliance with 42 CFR 483.80 infection control regulations and has implemented the CMS and Centers for Disease Control and Prevention (CDC) recommended practices to prepare for COVID-19.

On June 1, 2020, BTW received notice from LDHH — expressly on behalf of CMS — which notice is attached to this affidavit. Said notice stated in part:

> The Centers for Medicare & Medicaid Services (CMS) is committed to taking critical steps to ensure America's health care facilities are prepared to respond to the threat of disease caused by the 2019 Novel Coronavirus (COVID-19). In accordance with Memorandum QSO-20-20-All, CMS is suspending certain Federal and State Survey Agency surveys, and delaying revisit surveys, for all certified provider and supplier types. (Emphasis in original)
>
> During this time, CMS is prioritizing and conducting only the following surveys: focused infection control surveys, … .

***

> [T]he Louisiana State Survey Agency completed a COVID-19 Focused Survey at Booker T. Washington Skilled Nursing and Rehabilitation to determine if your facility was in compliance with Federal requirements related to implementing proper infection prevention and control practices to prevent the development and transmission of COVID-19. The survey revealed that your facility was in substantial compliance with participation requirements and no deficiencies were cited. The findings from this survey are documented on the enclosed Form CMS 2567. (Emphasis in original).

*See* Affidavit of Brownlee, Exhibit A, ¶¶ 7-8 (incorporating CMS and LDHH official inspection survey documents and CMS COVID-19 directives). CMS explicitly tied these actions to its "commit[ment] to taking critical steps to ensure America's health care facilities are prepared to respond to the threat of disease caused by … COVID-19". *See id.* at ¶8.

As an employee/federal contractor, LDHH issued directives requiring SNFs to follow CMS COVID-19 directives. These included the following:

- "**<u>MANDATING AND DIRECTING</u>** that All Nursing Facilities licensed in Louisiana implement and follow the provisions of the Centers for Medicare and Medicaid services (CMS) QSO-20-14-NH, Guidance for Infection

Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes, as Revised March 13, 2020. A copy of such CMS Guidance is attached." *See* LDHH Healthcare Facility Notice/Order, March 16, 2020, Exhibit C, 1 (emphases in original).[5] This CMS "guidance" (now a mandate) required facilities to –

- "***[R]estrict*** *visitation of* ***all*** *visitors and non-essential health care personnel, except for certain compassionate care situations*". *See* Exhibit C, 3 (emphases in original);[6]

- "*[N]otify potential visitors to defer visitation until further notice*". *See id.* (emphasis in original);

- "*[R]equire visitors to perform hand hygiene and use Personal Protective Equipment (PPE), such as facemasks*". *See id.* (emphasis in original);

- "*[C]ancel communal dining and all group activities*". *See id.*, 4 (emphasis in original);

- "*Implement active screening of residents and staff for fever and respiratory symptoms*". *See id.* (emphasis in original);

- "*Remind residents to practice social distancing and perform frequent hand hygiene*". *See id.* (emphasis in original);

- Provide instruction to visitors before they enter the building "*on hand hygiene, limiting surfaces touched, and use of PPE according to current facility policy while in the resident's room*". *See id.* (emphasis in original);

- Promulgate enumerated guidelines for "*necessary or allowable*" visitors. *See id.* (emphasis in original);

- Advise those entering the facility "*to monitor for signs and symptoms of respiratory infection for at least 14 days after exiting the facility. If symptoms occur, advise them to self-isolate* [,] and *immediately notify the facility of when they were in the facility, the individuals they were in contact with, and the locations within the facility they visited*". *See id.* (emphasis in original);

---

[5] Also available at https://ldh.la.gov/assets/medicaid/hss/docs/Coronavirus_2019/LDH_Nursing_Homes_Visitor_Restrictions_CMSGuidance_03162020.pdf (last visited May 9, 2022).

[6] Notably, this "guidance" provided strict detail regarding what constituted a "compassionate care situation[,]" how to handle it, and exceptions to the CMS "restrictions".

  - Follow CDC guidelines regarding admittance of COVID-positive residents. *See id.*, 4-5;
  - "*[R]einforce strong hand-hygiene practices* … and facemasks". *See id.*, 5 (emphasis in original);
  - "Properly clean, disinfect and limit sharing of medical equipment". *See id.*, 5;
  - "Provide additional work supplies to avoid sharing … and disinfect workplace areas". *See id.*;
  - "[T]ake actions to mitigate any resource shortages and … tak[e] all appropriate steps to obtain necessary supplies as soon as possible". *See id.*;
  - "[C]ontact the local and state public health agency to notify them" of PPE shortages. *See id.*

- "**DIRECTING** that all … nursing facilities adhere to … provisions, restrictions, and limitations" regarding discharge of acute care patients with suspected COVID-19 to SNFs in coordination with "the requirements of CMS Guidelines". *See* LDHH Healthcare Facility Notice/Order, March 26, 2020, Exhibit D, 1-2 (emphases in original).[7]

Accordingly, CMS "guidance" became mandates and directives through the federal government's agent, contractor, and AHJ – LDHH. Had BTW not strictly complied with these federal mandates (enforced by LDDH on behalf of CMS), it would have been cited and fined. *See* Affidavit of Brownlee, Exhibit A, ¶¶ 7-8.

As further example, LDHH issued notices and memoranda that:

- "**DIRECT[ED] AND REQUIR[ED]** that all licensed healthcare facilities in Louisiana … **IMMEDIATELY PROHIBIT** all non-essential visitors" during a period of time. *See* LDHH Healthcare Facility Notice, March 12, 2020, Exhibit E, 1 (emphases in original).[8] This Notice included specific definitions, exceptions, and further directives to implement specific policies and procedures. *See id.*, 2.

---

[7] Also available at https://ldh.la.gov/assets/medicaid/hss/docs/Coronavirus_2019/LDH_MEMO_re_Hospital_Discharges_to_NF_03262020.pdf (last visited May 6, 2022).

[8] Also available at https://ldh.la.gov/assets/medicaid/hss/docs/Coronavirus_2019/Visitor_Restriction_03122020.pdf (last visited May 6, 2022).

- Directed SNFs to adhere to a policy waiving pre-admission screening and resident review for residents with suspected mental illness or intellectual disability for thirty days before proceeding with reviews "as soon as resources become available." *See* LDHH Healthcare Facility Notice/Order, March 24, 2020, Exhibit F.[9]

- Directed SNFs to work with PPE vendors for equipment. *See* LDHH Memorandum, March 25, 2020, Exhibit G.[10]

- Directed SNFs and hospitals to "work cooperatively on discharge planning …." *See* LDHH Healthcare Facility Notice/Order, April 24, 2020, Exhibit H.[11]

LDHH also promulgated a "Nursing Home Facility Toolkit" (Exhibit I)[12] that provides reporting requirements. *See* Exhibit I, 7 and 11. These provisions "**DIRECT[ED] AND REQUIR[ED]** … all licensed nursing facilities in Louisiana [to] comply with the attached Memorandum from [CMS] regarding COVID-19 reporting requirements and notification requirements …." *See* LDHH Healthcare Facility Notice/Order, May 7, 2020, Exhibit J, 1-2 (emphases in original).[13] *See* Nursing Home Facility Toolkit, Exhibit H, 7. BTW complied with these reporting requirements. *See* Affidavit of Brownlee, Exhibit A, ¶12.

BTW's function as an all-COVID is one demonstration of BTW's intensive participation in the federal government's coordinated response to the COVID-19 pandemic. It is further support that as a particular "program planner", BTW is entitled to the federal protections of Federal Officer

---

[9] Also available at https://ldh.la.gov/assets/medicaid/hss/docs/Coronavirus_2019/LDH_MEMO_Re_PASRR_1135_Waiver_Final_03242020.pdf (last visited May 9, 2022).

[10] Also available at https://ldh.la.gov/assets/medicaid/hss/docs/Coronavirus_2019/Available_PPE_from_YOUR_VENDOR_03252020.pdf (last visited May 6, 2022).

[11] Also available at https://ldh.la.gov/assets/medicaid/hss/docs/Coronavirus_2019/SHO_LDH_Memo_Hospital_Discharges_04242020.pdf (last visited May 9, 2022).

[12] Also available at https://ldh.la.gov/assets/medicaid/hss/docs/Coronavirus_2019/LDH_NH_Facility_Toolkit.pdf (last visited May 6, 2022).

[13] Also available at https://ldh.la.gov/assets/medicaid/hss/docs/Coronavirus_2019/LDH_MEMO_NF_RC19ICwCMSR_05072020.pdf (last visited May 9, 2022).

Removal. HHS's direction and control of Defendants direct and by and through LDHH – a federal contractor and a state-level AHJ – uniquely situates BTW as a federal officer and instrumentality. Declaration, 85 Fed. Reg. at 15,198 (defining and declaring PREP Act "covered persons" to be those licensed entities formally working through HHS's AHJs). *See* Exhibits B through J (LDHH letter, notices, memoranda, and toolkit).

Approximately two months after the Secretary's Declaration was issued, BTW directly coordinated with LDHH, a federal employee/contractor to become an all-COVID skilled nursing facility, as part of a national infection control effort. *See* Affidavit of Brownlee, Exhibit A, ¶¶2-6, 8; Exhibits B through J (LDHH letter, notices, memoranda, and toolkit).[14] Additionally, BTW was under the direction of CMS to mitigate the spread of COVID-19 among senior citizens in Louisiana and beyond. Affidavit of Brownlee, Exhibit A, ¶¶6-13 (discussing transfers into BTW from other states). Such federal purpose, direction, and control during the limited period of the COVID-19 Declaration illustrates federal surrogacy and substantiates the "acting under" prong of 28 U.S.C. §1442(a) federal officer protection. AO 20-04, 4 (formally adopted into the HSS Declaration).

These facts and this argument were not presented in the *Mitchell* or *Perez* cases.

2. *Congress Specifically Anticipated Federal Officer Involvement In the PREP Act Implementation and Litigation Process*

Congress expressly refers to federal officer involvement in subsections (d)(1) and (f) of 42 U.S.C. §247d-6d. In subsection (f), Congress provides that federal "agencies" (such as HHS), "instrumentalities" (such as AHJs, healthcare infrastructure participants and senior-assisted

[14] The HHS Secretary is empowered, in coordination with the CDC, to arrange appropriate quarantine/isolation processes to prevent and stop pandemic spread among states. 42 U.S.C. §264; 42 C.F.R. §§70, *et. seq*; *see also* Affidavit of Brownlee, Exhibit A, ¶5 (BTW accepted COVID-19 patients from around the United States).

facilities) and "officers" (such as program planners) will keep federal statutory protections, such as 28 U.S.C. §1442(a), regardless of any provision of the PREP Act:

> Nothing in this section shall be construed to abrogate or limit ***any right***, remedy, or authority that the United States or ***any agency thereof may possess under any other provision of law*** or to waive sovereign immunity or to abrogate ***or limit any defense or protection*** available to the United States or its ***agencies, instrumentalities, officers***, or employees ***under any other law***, including any provision of chapter 171 of Title 28 (relating to tort claims procedure).

42 U.S.C. §247d-6d(f) (emphases added).[15] Subsection (f) thrice refers to types of legal protections for federal officers such as BTW by citing to "other provisions of law," "any defense or protection," and "any other law," which would include the protection of 28 U.S.C. §1442(a). Subsection (f) also refers to two categories of federal agents to be protected, to-wit: "instrumentalities" and "officers" of HHS. *See* Defendants' Response in Opposition to Remand [Doc. 21], 20-25 (explaining how and why BTW is an HHS instrumentality and officer).

Subsection (f)'s assurance of statutory protections to federal instrumentalities and officers is expressly incorporated into subsection (d)(1) of the PREP Act: "***Subject to subsection (f)***, the sole exception to the immunity from suits shall be for an exclusive Federal cause of action." 42 U.S.C. §247d-6d(d)(1) (emphases added). By incorporating subsection (f) into subsection (d)(1), Congress makes clear that the creation of the PREP Act cause of action is not abrogating or limiting any federal protection, such as §1442, that is otherwise bestowed upon an instrumentality or officer

---

[15] Note that LDHH is also a " covered person" as defined under the PREP Act and is therefore an AHJ federal officer in addition to being a federal contractor. *See* §247d-6d(i)(2) (defining a "covered person" as "a person or entity that is … a program planner of [a covered] countermeasure [or] a qualified person who … administered[] or dispensed such countermeasure").

of one of the federal government's agencies. Therefore, Plaintiffs are incorrect in asserting that Congress did not anticipate that a public health crisis, such as the COVID-19 pandemic, would involve private federal officers and instrumentalities that would need all the protections federal law provides, including 28 U.S.C. §1442(a). Indeed, Congress planned on it.

BTW is entitled to federal officer removal protections under 28 U.S.C. §1442(a).

## CONCLUSION

WHEREFORE, Defendants respectfully request that this Court issue an order denying Plaintiffs' motion to remand.

Respectfully submitted,

By: /s/ Ronald E. Raney
RONALD E. RANEY, Bar Roll #8570

**LUNN IRION LAW FIRM, LLC**
A Limited Liability Company
8670 Box Road, Building A
Shreveport, LA 71106
Tel. (318) 222-0665
Fax (318) 220-3265
Email: rer@lunnirion.com

HALL BOOTH SMITH, P.C.
TERESA PIKE TOMLINSON
Georgia Bar No. 466930
*Pro Hac Vice*
1301 First Avenue
Suite 100
Columbus, GA 31901
Tel: (706) 494-3818
Fax: (706) 322-5469
Email: ttomlinson@hallboothsmith.com

**ATTORNEYS FOR PMG OPCO-WASHINGTON, LLC D/B/A BOOKER T. WASHINGTON SKILLED**

**NURSING & REHABILITATION CENTER, AND KOURTNEY BROWNLEE**

**CERTIFICATE OF SERVICE**

A copy of the foregoing Defendants' Supplemental Argument and Authority in Further Opposition to Plaintiff's Motion to Remand has been served upon all counsel of record pursuant to the court's electronic docket system this 13th day of May, 2022.

/s/ Ronald E. Raney

74585484-1